UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-58-B-W-04 |
| | ) | |
| JOHN PASCUCCI | ) | |

**SENTENCING ORDER**

Upon review of the extensive and conflicting evidence in this much litigated drug trafficking conspiracy, the Court finds that it is more likely than not that John Pascucci, a co-conspirator, is personally responsible for between 50 and 100 kilograms of marijuana and will sentence him under the provisions of 18 U.S.C. § 841(b)(1)(C); more specifically, the Court finds that the Defendant is responsible for 90.7 kilograms of marijuana for a base offense level of 24 under U.S.S.G. § 2D1.1(c)(8), and, after reducing the offense level by three points for acceptance of responsibility, calculates the total offense level to equal 21 for a guideline sentence range at criminal history category II of forty-one to fifty-one months.

I.   **BACKGROUND**

   A.   **The Pelletier Conspiracy**

On January 12, 2009, John Pascucci pleaded guilty to engaging in a conspiracy to distribute marijuana in violation of federal criminal law. The Amended Prosecution Version of the Offense, which Mr. Pascucci admitted was true, said that beginning on a date not before January 1, 2003 and continuing to a date not later than April 1, 2006, Mr. Pascucci conspired with others, including Michael Pelletier, to possess marijuana with the intent to distribute it. *Am. Prosecution Version of the Offense* at 1 (Docket # 591) (*Prosecution Version*). The Prosecution Version goes on to state that the conspiracy "as a whole distributed more than 1,000 kilograms of

marijuana", but Mr. Pascucci "was not involved in the distribution of more than 1,000 kilograms of marijuana, nor was the distribution of that amount reasonably foreseeable to him during his involvement in the conspiracy." *Id.* Although Mr. Pascucci, who lived in southern Maine, admitted that he was a customer of Michael Pelletier, who lived in northern Maine, there was no express admission as to drug quantity. *Id.*

At the time of the guilty plea, the parties agreed to defer the resolution of the question of drug quantity to sentencing, and they agreed, in making its determination, that the Court could review the transcripts of the trials of other members of the Pelletier conspiracy. *Gov't's Sentencing Mem. Re: Drug Quantity* at 1 n.2 (Docket # 632) (*Gov't's Mem.*); *Def.'s Sentencing Mem. Re: Drug Quantity* at 2 n.2 (Docket # 633) (*Def.'s Mem.*).

They have assumed markedly different positions on this critical issue. The Government claims that Mr. Pascucci should be held responsible for his involvement in the conspiracy from June 2004 to after November 2004 for a total of twenty-one transactions at 25 pounds per transaction for a total of 238.14 kilograms and a base offense level of 26.[1] *Gov't's Mem.* at 2. Mr. Pascucci claims that he should be held responsible for involvement in the conspiracy from June 2004 ending in November 2004 for a total of four transactions at 25 pounds per transaction for a total of less than 100 kilograms and a base offense level of 20. *Def.'s Mem.* at 15-16. The Government has not contested the Probation Office's recommendation that the base offense level be reduced three levels for acceptance of responsibility under U.S.S.G. § 3E1.1.

The arithmetic has profound consequences. Under 21 U.S.C. § 841(b)(1)(B), if the quantity of marijuana attributable to Mr. Pascucci exceeds 100 kilograms, the statutory

---

[1] The Government's calculation appears to be slightly in error. It calculated the total quantity to be 238.6 kilograms. The correct calculation is 21 x 25 = 525 x .4536 kg = 238.14, not 238.6. This minor computational error makes no difference, but the Court has inserted the correct figure.

2

mandatory minimum of ten years applies. 21 U.S.C. § 841(b)(1)(B).[2] If Mr. Pascucci is correct, the applicable penalty section is § 841(b)(1)(C) and although the maximum period of incarceration is thirty years, there is no mandatory minimum, and the sentencing guideline range would be only twenty-seven to thirty-three months.[3]

      **B.**      **The Government's View**

The Pelletier conspiracy involved the transportation of marijuana from Canada across the St. John River into the state of Maine. The Pelletier indictment charged that Mr. Pelletier, Michael Easler, Ben Dionne, Raymond Fogg, Anthony Caparotta, and Mr. Pascucci were co-conspirators. *Indictment* at 2. The Court presided over trials involving Mr. Pelletier, Mr. Fogg, and Mr. Caparotta; Mr. Easler, Mr. Dionne, and Mr. Pascucci pleaded guilty; the Court has sentenced each conspirator, except for Mr. Pascucci.[4] In each trial, the Government called as a primary witness a man named Adam Hafford. Mr. Hafford met Mr. Pelletier while they were in prison, and when he was released, Mr. Hafford contacted Mr. Pelletier for work. Mr. Pelletier assigned him the task of traveling over to the Canadian side of the St. John River, meeting the marijuana suppliers, and swimming the marijuana across the river to the American side. Mr. Hafford was also involved in the distribution of the marijuana to various members of the Pelletier conspiracy.

---

[2] The Presentence Report (PSR) confirms that on December 29, 1997, Mr. Pascucci was convicted of Unlawful Trafficking in Scheduled Drugs in Cumberland County Superior Court for the state of Maine. *Presentence Report* at ¶ 44. He was sentenced to two years and six months, with all but three months suspended. *Id.* The Probation Office counted this prior felony drug offense as a predicate for the enhanced penalty of ten years to life in § 841(b)(1)(B). With acceptance, the guideline range would be fifty-one to sixty-three months, but the statutory minimum trumps the guideline.

[3] At criminal history category II and a total offense level of seventeen, the applicable guideline range is twenty-seven to thirty-three months.

[4] The Court sentenced Mr. Pelletier to a mandatory term of life in prison; Mr. Easler to 145 months; Mr. Dionne to 24; Mr. Fogg to 63; and, Mr. Caparotta to 68. The Court presided over the trial of Archie Ladner, an individual the Government alleged was part of the conspiracy, but who was not convicted.

More specifically, Mr. Hafford testified that he began swimming marijuana across the St. John River in June 2004. *Adam Hafford Test.* at 101:16-18 (Docket # 488) (*Hafford Test. Fogg, Caparotta Trial*).[5] The last time he transported marijuana was in November 2004. *Id.* at 102:15-19. In terms of frequency, he said that he usually made the trip once a week. *Id.* at 101:19-21. On all occasions, except two, he brought 60 pounds of marijuana across the river; once he brought 180 pounds, and once he brought 220 pounds.[6] *Id.* at 101:22-25. He said that Michael Pelletier directed him to bag the marijuana for his customers. Specifically, he said that "um, usually every time - - every time I went across the border, he (Mr. Pelletier) would tell me to bag like 25 for Scoochy and 5 or 10 for Fogg - - or 15."[7] *Id.* at 105-06:24-1.

Counting the number of weeks from June to November, the Government arrives at 21 weeks, which at one trip per week and 25 pounds per trip, equals 525 pounds or 238.14 kilograms, well above the 100 kilogram statutory tripping point for the mandatory minimum. The Government adds that these amounts do not include marijuana delivered to Mr. Pascucci by Mr. Hafford's predecessor, Michael Easler. Mr. Easler, the Government points out, told Mr. Hafford that he had been bringing 60 pounds of marijuana per trip across the St. John and further that he had collected $50,000 from Mr. Pascucci on behalf of Mr. Pelletier. *Adam Hafford Test.* at 115:17-25; 116:21-25; 117:1-4 (Docket # 308) (*Hafford Test. Pelletier Trial*). They also do not include a trip that Mr. Pelletier's former girlfriend, Kendra Cyr, made in November after Mr. Pelletier had gone to prison to pick up a bag of cash from Mr. Pascucci,[8] *Kendra Cyr Test.*

---

[5] Citations to testimony will be to the Fogg, Caparotta trial under this docket number, unless specified otherwise.
[6] Mr. Hafford's testimony on this last point was somewhat unclear. He stated: "Um, on all occasions, except for two, 60 pounds, and once I brought over 180, and another time I brought over 100 - - or 220." *Hafford Test. Fogg, Caparotta Trial.* at 101:21-25. The Court interprets his testimony to say that he regularly brought 60 pounds over the river, and that once he brought 180 pounds and another time 220 pounds.
[7] Scoochy is Mr. Pascucci's nickname.
[8] There is some confusion about when Mr. Pelletier returned to prison. The Government writes that "Kendra Cyr testified that after Pelletier went to jail in November 2005 she met Pascucci in Portland and picked up a bag of cash as well". *Gov't Mem.* at 2 n.4 (emphasis supplied). It also writes that "Hafford also testified that after Pelletier

76:12-19; 77:12-25 (Docket # 399) (*Cyr Test. Pelletier Trial*), and a distribution that Mr. Hafford said he made to Mr. Pascucci after Mr. Pelletier had returned to prison. *Hafford Test. Fogg, Caparotta Trial* at 107-08:3-1; 109:5-7. Finally, the Government points to Mr. Pascucci's own statement that he had been involved with Mr. Pelletier for about a year.

### C.   Mr. Pascucci's View

#### 1.   The Modus Operandi

Mr. Pascucci reviews the modus operandi for Pelletier's deliveries of marijuana from St. David, Maine, where Mr. Pelletier lived, to South Portland, where Mr. Pascucci picked up the marijuana. Mr. Pascucci says that Mr. Pelletier was careful to have another individual, usually Archie Ladner, deliver the marijuana, while he separately picked up the cash. After getting the marijuana across the river, before heading down to South Portland, Mr. Pascucci says Mr. Pelletier would call him to confirm the arrangement. The distance from St. David to South Portland is approximately 350 miles one way, a trip of about six hours, and Mr. Pelletier was and is paralyzed from the waist down. When he made the trip from St. David to South Portland, he always stayed overnight at a nearby motel.

Mr. Pascucci argues that the best evidence of the number of deliveries to him is the Government's evidence of telephone records reflecting calls between Mr. Pelletier and Mr. Pascucci and of hotel stays by Mr. Pelletier in the South Portland area. By synchronizing the calls and the hotel stays, Mr. Pascucci urges the Court to conclude that the Government has not proven that he was involved in a conspiracy to distribute more than 100 kilograms of marijuana.

---

went to jail in November 2006, he made one trip himself, delivering marijuana to Rocky in Winn and Defendant Pascucci in Portland." *Id.* at 2 (emphasis supplied). There is substantial other evidence, however, that Mr. Pelletier was arrested in November 2004. It may have been that Ms. Cyr waited a year after Mr. Pelletier's arrest before he directed her to pick up cash from Mr. Pascucci, but seems more likely it was November 2004. Ms. Cyr testified that she collected money from Mr. Pascucci "sometime in November after Michael went into jail." *Cyr Test. PelletierTrial* at 76:16-17. The year, however, was not specified.

### 2.   Adam Hafford

Mr. Pascucci first sets about the task of discrediting Adam Hafford, whose testimony standing alone would be sufficient to find that Mr. Pascucci was directly involved in considerably more than 100 kilograms of marijuana. Following his arrest, Mr. Hafford cooperated with the Government, made multiple proffers to law enforcement, and testified five times under oath regarding the Pelletier conspiracy. Mr. Pascucci observes that Mr. Hafford himself admitted that "he had exaggerated his testimony to help himself and that during his involvement he was using drugs, not only smuggling for Pelletier, but also smuggling for his own separate marijuana customers, smuggling cocaine as well as, dealing methamphetamine." *Def.'s Mem.* at 8. Mr. Pascucci points out that there are a number of inconsistencies in Mr. Hafford's testimony, *id.* at 7 n.5, and urges the Court "to hold Hafford's conflicting testimony against his credibility, and in favor of a conservative approach to the quantity determination." *Id.* at 8.

### 3.   Kendra Cyr

Kendra Cyr was Michael Pelletier's girlfriend from October 2001 until November 2004, when he was arrested, and they lived together for two of those years. *Kendra Cyr Test.*, *United States v. Archie Ladner*, 06-cr-79-B-W at 77:18-22; 83:1-4 (Docket # 82) (*Cyr Test. Ladner Trial*). Ms. Cyr testified that "on average" during this two year interval, Mr. Pelletier was traveling to Portland "once per month." *Id.* at 99:8-12.

### 4.   Jeffrey Dubois

Jeffrey Dubois was another member of the conspiracy.[9] For a while Mr. Dubois lived in northern Maine and while there, he began buying marijuana from Mr. Pelletier. Later, he moved

---

[9] Mr. Dubois pleaded guilty to his role in the conspiracy and on June 25, 2009, the Court sentenced him to three months incarceration. *United States v. Dubois*, 09-cr-78-B-W (Docket # 10).

to southern New Hampshire and continued to buy marijuana from Mr. Pelletier. Mr. Dubois testified that after he moved to New Hampshire, he continued to receive marijuana from Mr. Pelletier every month, month and a half, and on occasion every two months. *Jeffrey Dubois Test.* at 37:9-24 (Docket # 308).

When Mr. Pelletier was in jail in mid-2005, he met a fellow inmate, John Parker, and attempted to recruit Mr. Parker to work for his marijuana smuggling operation. *John Parker Test.* at 111:1-11; 115:8-11 (Docket # 312). Mr. Pelletier literally handwrote out the essential aspects of the conspiracy for Mr. Parker, including driving directions to the Chili's Restaurant parking lot in South Portland, where they were meeting. *Id.* at 116:1-9; *Gov't's Ex.* 44. Mr. Parker saved Mr. Pelletier's handwritten notes, which state that "Scoochy" was "same time as Jeff the Plumer (sic)". *Id.*

### 5. Michael Easler

Before Adam Hafford, there was Michael Easler. Mr. Easler was the person Mr. Pelletier initially recruited to swim the St. John and he did so from May 2003 (at the latest) until the spring of 2004, when Mr. Easler made off with a significant amount of Mr. Pelletier's cash. *See generally Erica Fox Test.* (Docket # 307); *Cyr Test. Ladner Trial at* 85:7-10 . Mr. Pascucci says that even if Mr. Easler worked for Mr. Pelletier for approximately one year before Mr. Hafford took over the drug smuggling job, there is limited evidence linking the marijuana conspiracy during that interval to Mr. Pascucci and no evidence of the quantity of marijuana delivered to him during the Easler era. *Def.'s Mem.* at 13-14.

### 6. The November 2004 Hafford Delivery and Cyr Pick Up

Adam Hafford testified that after Michael Pelletier went to jail in November 2004, he made a trip to South Portland and delivered 25 pounds of marijuana to Mr. Pascucci. *Hafford*

7

*Test. Fogg, Caparotta Trial* at 107-08:3-1; 109:5-7. Pointing out contradictions in Mr. Hafford's testimony, Mr. Pascucci urges the Court to discount this last alleged delivery to Mr. Pascucci. *Def.'s Mem.* at 12-13.

Kendra Cyr testified that, after Mr. Pelletier went to prison in November, she collected a bag of cash from Mr. Pascucci, *Cyr Test. Pelletier Trial at* 76:12-19; 77:12-25. Mr. Pascucci implies that there is no evidence as to whether the cash was for previously delivered marijuana or a new delivery. *Def.'s Mem.* at 13. He says that Kendra Cyr's testimony does not provide a basis to find an additional delivery of 25 pounds of marijuana in November after Mr. Pelletier was imprisoned. *Id.*

### 7. Telephone and Hotel Records

Focusing solely on Mr. Pelletier's known motel visits in the South Portland area, Mr. Pascucci says that the evidence reflects four overnight stays. *Def.'s Mem.* at 9-10. He acknowledges that using 25 pounds per delivery, he would be responsible for 100 pounds of marijuana or 45.35 kilograms. *Id.* at 10. Comparing the telephone records of calls between Mr. Pelletier and Mr. Pascucci, Mr. Pascucci concedes that the pattern of calls could result in three more transactions for an additional 75 pounds or 79.37 kilograms. *Id.* at 12.

## II. DISCUSSION

### A. Legal Standard

The statutory maximum sentence in a drug conspiracy case is determined from a "conspiracy-wide perspective."[10] *United States v. Colon-Solis*, 354 F.3d 101, 103 (1st Cir.

---

[10] Mr. Pascucci admitted the contents of the Amended Prosecution Version, which stated that "the conspiracy as a whole distributed more than 1,000 kilograms of marijuana." *Pros. Version* at 1. Based on the conspiracy-wide quantity, the Plea Agreement specified that Mr. Pascucci was subject to a maximum term of imprisonment of "no less than twenty years and no more than life." *Agreement to Plead Guilty (With Stipulations and Appeal Waiver)* at 1 (Docket # 586). In accordance with *Colon-Solis*, the conspiracy-wide quantity made the mandatory minimum of ten years (which the Government is now arguing) "*potentially* available". 354 F.3d at 103 (emphasis in original).

2004). When sentencing a defendant convicted of participating in a drug-trafficking conspiracy, however, the Court must not "automatically shift the quantity attributable to the conspiracy as a whole to the defendant." *United States v. Cruz-Rodriquez*, 541 F.3d 19, 32 (1st Cir. 2008) (citing *Colon-Solis*, 354 F.3d at 103). Rather, the "[C]ourt must determine the specific quantity of drugs for which the defendant is [personally] responsible." *United States v. Rivera Calderon*, 2009 U.S. App. LEXIS 19122, *40 (1st Cir. 2009). This determination includes making "an individualized finding as to the drug amounts attributed to, or foreseeable by, that defendant." *United States v. Sanchez-Badillo*, 540 F.3d 24, 35 (1st Cir. 2008) (citing *Colon-Solis*, 354 F.3d at 103). "A defendant can only be sentenced on the basis of drugs he handled, anticipated handling, or for drugs that he could reasonably foresee being used in the conspiracy." *United States v. Gonzalez-Velez*, 466 F.3d 27, 38 (1st Cir. 2006) (citing *United States v. Sepulveda*, 15 F.3d 1161, 1197 (1st Cir. 1993)); *see also Rivera Calderon*, 2009 U.S. App. LEXIS 19122, *40; *Sanchez-Badillo*, 540 F.3d at 35. The defendant can therefore be found to be "responsible not only for the drugs he actually handled but also for the full amount he could reasonably have anticipated would be within the ambit of the conspiracy." *Sanchez-Badillo*, 540 F.3d at 35.

A defendant-specific determination of drug quantity must be "supported by a preponderance of the evidence." *Rivera Calderon*, 2009 U.S. App. LEXIS 19122, * 41. The finding must have "demonstrable record support" and be based on reliable evidence. *Id.* (quoting *United States v. Rivera-Maldonado*, 194 F.3d 224, 228-29 (1st Cir. 1999). Reliable evidence may include the testimonial evidence of cooperating witnesses. *Id.* (stating that the "testimonial evidence [of a cooperating witness] alone may be sufficient to support a district court's quantity determination"). Finally, the Court's drug quantity finding need not be exact: a

---

But, to determine whether the quantity triggers the mandatory minimum, the "sentencing court must make a specific finding, supportable by a preponderance of the evidence, ascribing the triggering amount to that coconspirator." *Id.*

reasonable estimate or average is sufficient. *Id*.; *Sanchez-Badillo*, 540 F.3d at 35 (stating that "an approximation that represents a reasoned estimate suffices") (internal punctuation omitted).

### B.  The Evidence

In delineating markedly differing periods of incarceration for different levels of quantity in a drug trafficking conspiracy, Congress and the Sentencing Commission assigned the courts a task that is easier legislated and promulgated than adjudicated. Sometimes the breadth of the drug trafficking conspiracy fits neatly within the statutory penalty categories, and it is a simple matter to find a defendant responsible for less than 50 kilograms, between 50 and 100 kilograms, between 100 and 1,000 kilograms, or more than 1,000 kilograms. 21 U.S.C. § 841(b)(1)(A)-(D). However, in some cases, like this one, the issue of drug quantity is contested, and the Court must turn to evidence that is commonly less than straightforward. Drug traffickers rarely leave behind detailed financial records, statistical compilations of their inventory, or business records of their deliveries, and law enforcement investigations and trials often take place months and sometimes years after the conspiracy unraveled, leaving critical witnesses with hazy memories in areas where the statute contemplates exactness. Added to the mix is the complicated business of assessing the accuracy of the testimony of cooperating witnesses, who arrive at the courthouse carrying excess baggage.

#### 1.  Amount per Delivery

The Probation Office calculated its drug quantity recommendation on the premise that Mr. Pascucci received 25 pounds of marijuana with each delivery. *Presentence Report* at 5 (PSR). Mr. Pascucci objects, contending that there is evidence that Mr. Hafford only knew three customers down state, Raymond Fogg, Jeffrey Dubois, and Mr. Pascucci, and as Mr. Hafford said he always packaged 25 to 30 pounds for each downstate delivery, Mr. Pascucci could not

have received 25 pounds with each delivery. *Def.'s Mem.* at 14. Further, Mr. Pascucci points out that Mr. Hafford testified that the value of the drugs he packaged for downstate was $30,000 to $50,000 and that Mr. Pelletier was selling marijuana for $2,400 to $2,800 per pound. *Id.* At the highest value of $50,000 at $2,400 per pound, Mr. Pascucci contends the math does not work, since the total amount packaged for downstate would only equal 20 pounds. *Id.* at 14-15.

Mr. Pascucci's objection illustrates why it is often difficult to make precise findings about drug quantity in drug trafficking conspiracies. The evidence of drug quantity is often equivocal. Nevertheless, on this point, the Court finds that Mr. Hafford was credible when he repeatedly testified that 25 pounds was generally the amount delivered to Mr. Pascucci, *Hafford Test. Ladner Trial* at 30: 10-12 (Docket # 81); *Hafford Test. Fogg, Caparotta Trial* at 105-06:21-1, and was the amount delivered in November 2004.[11] *Id.* at 109: 5-16. As Mr. Hafford swam about 60 pounds of marijuana each time across the St. John River, the 25 pound figure is well within the total smuggled amount. Further, in the Pelletier trial, Mr. Hafford testified that "30, 35 pounds" were sent downstate each time, *Hafford Test. Pelletier Trial* at 103: 14-16, that Mr. Pelletier's other customers were only receiving between 5 and 10 pounds of marijuana. *Id.* at 109:5-16; *Hafford Test. Ladner Trial* at 30:7-13. Based on the cumulative testimony, the Court finds that it is more likely than not Mr. Pascucci received at least twenty-five pounds of marijuana per delivery.

### 2. The Minimum Quantity

Based on the cumulative evidence, the Court without hesitation finds that Mr. Pascucci is responsible for more than 50 kilograms and, therefore, at the very least the penalty provisions of § 841(b)(1)(C) apply. Mr. Pascucci's own argument, which the Court accepts for purposes of a

---

[11] Mr. Parker made a note in the Pelletier memorandum that Mr. Pascucci was Mr. Pelletier's "main buyer" and got "40 – 50 lbs at a time." *See Gov't's Ex.* 44 at 3; *Parker Test. Pelletier Trial at* 127:24-25; 128:1-9. Mr. Parker testified, however, that his knowledge about Mr. Pascucci came from Mr. Pelletier. *Id.* 128:7-9.

11

quantity floor, convincingly establishes that 79.37 kilograms is a reasonable estimate of a minimum quantity for which he should be held responsible.

### 3. Number of Deliveries

The focus turns to the number of deliveries and whether the Government has demonstrated that Mr. Pascucci should be held responsible for an additional 20.63 kilograms, an amount equal to less than two deliveries of 25 pounds of marijuana, making applicable the penalty provisions of § 841(b)(1)(C) - with its ten year mandatory minimum. First, the Court agrees with Mr. Pascucci that the cash that Kendra Cyr picked up in November 2004 after Mr. Pelletier had gone into prison should not be counted as a separate delivery. There is evidence that she retrieved a shopping bag filled with cash, but according to Ms. Cyr, she never counted it and just put it in the closet.[12] Whether she was picking up this cash for marijuana that had already been delivered and thus, already accounted for, or whether she was engaged in a new transaction is unknowable. But, the Court cannot conclude that the cash represented money for a drug delivery not already counted.

Second, the Court agrees with Mr. Pascucci that it can make no factual findings about Pascucci's drug quantity during the Easler period of the conspiracy. Mr. Easler swam the St. John for Mr. Pelletier from at least May 2003 to the late spring of 2004. But, the telephone and motel records confirm that before June 2004, there was only one call between Mr. Pelletier and Mr. Pascucci of two minutes duration on January 20, 2004, and the first evidence of a Pelletier motel stay in South Portland was not until mid-July 2004.

---

[12] Despite extensive involvement in the Pelletier drug trafficking conspiracy, including collecting the cash, counting out ill-gotten gains at least ten to fifteen times, calling Michael Easler's girlfriend in an attempt to locate him, buying real estate with Michael Pelletier, and living the high lifestyle of a major drug dealer's girlfriend, Ms. Cyr was never charged with a crime. Her narrow escape from criminal liability could lead to questions about her credibility, since she had powerful incentives to inculpate others. Nevertheless, the Court has had multiple opportunities to evaluate Ms. Cyr's testimony, and has concluded that her testimony is generally reliable.

This leaves the Hafford period from June 2004 to November 2004.  The Court is reluctant to rest its findings on Mr. Hafford's testimony alone.  The nub of the Court's concern is that if Mr. Hafford was hauling 60 pounds of marijuana per week across the St. John from June to November 2004, it is surprising there is no evidence of more regular visits to South Portland by Mr. Pelletier.  Mr. Pelletier was the central figure of this conspiracy, and even though confined to a wheelchair, he was able to recruit others to do his legwork.  What is also apparent, however, is that by late June of 2004, Mr. Pelletier was keeping a close eye on the money.  After all, he had just been burned by Michael Easler, who that spring had run off with thousands of his dollars, and as drug conspiracies tend to go, Mr. Pelletier in turn owed a significant portion of that money to his Canadian contacts.[13]  Drug trafficking in which a runner handles the drugs and in which the figure up the chain takes care of the money is prevalent, and there is no evidence that apart from a limited faith in Ms. Cyr, Mr. Pelletier had a subordinate he trusted with the money.  It is also logical that being confined to a wheelchair, Mr. Pelletier would have found it difficult to travel from St. David to Portland and back in one day, and would have stayed over in the Portland area at least for the night.

In light of this history, the evidence of only four overnights at motels near South Portland from late June 2004 to November 2004 represents a striking lack of proof.  During the interval when Mr. Pelletier was out of prison and was running this conspiracy, the Court is confident in relying on the combination of motel and telephone records to make quantity determinations, but in the absence of documentary backup, it is not confident about drawing any other quantity

---

[13] Kendra Cyr confirmed that a man named Roger, who came from Canada, worked for "the head person."  *Cyr Test. Pelletier Trial* at 59:8-25; 60:1-8.  After Michael Easler made off with Mr. Pelletier's money, Kendra Cyr got calls from Roger saying that Mr. Pelletier owed him money.  *Id.* at 66:15-22.  Further, Erika Fox, Michael Easler's girlfriend, described an unnerving early visit in the wee hours of the night by five armed Hell's Angels, including Roger, who demanded to know where Michael Easler was and warned her that the "boy with no legs wants his money," which she took to refer to Mr. Pelletier.  *Erika Fox Test.* at 153:4-16.

13

conclusions.  This is not to say that there is not a fair amount of evidentiary smoke that strongly suggests that Mr. Pascucci was much more deeply involved in the Pelletier conspiracy for a longer period and in substantially greater quantities than the Court has found.  However, the Court must rule on the evidence, not on its suspicions.  Applying this logic to the evidence or more precisely the lack of evidence, the Court cannot find that it is more likely than not Mr. Pascucci received marijuana on occasions other than seven times or a total of 79.37 kilograms.[14]

This leaves the last delivery in November 2004, after Mr. Pelletier had gone to jail.  Even if counted, this delivery would not raise Mr. Pascucci's drug quantity to 100 kilograms or more for statutory purposes.  Nevertheless, the delivery affects the guideline calculation.  An additional 25 pounds of marijuana increases the kilogram total to 90.7, a base guideline level of 24.  The Court accepts Mr. Hafford's testimony that after Mr. Pelletier returned to prison in November 2004, he took over the distribution network for a while, and made an additional delivery to Mr. Pascucci.  There is no evidence that Mr. Pelletier had an obvious successor, and the evidence establishes that Mr. Hafford knew enough about the operation to be tempted to make at least one delivery himself.  Further, Mr. Hafford supplied enough detail about this transaction to convince the Court that it occurred.  *Hafford Test. Fogg, Caparotta Trial* at 107:3-25; 108:1; 109:5-7.

All told, the Court finds that Mr. Pascucci is responsible for 90.7 kilograms of marijuana.

---

[14] In his memorandum, Mr. Pascucci acknowledges that even though the Government produced evidence of only four motel stays between June and November 2004, the pattern of calls suggests that there were likely at least three other transactions.  The Court accepts Mr. Pascucci's view of the pattern of the calls and, therefore, adds three additional transactions.  It is true that there is no evidence of motel stays in Portland confirming these three additional transactions, but the standard of proof here is more likely than not and in reviewing the pattern of telephone calls, the Court finds it is likely at least three transactions took place even though there is no corresponding evidence of motel stays.

**III.   CONCLUSION**

The Court finds that the Government has demonstrated that it is probable John Pascucci is responsible for between 50 and 100 kilograms of marijuana, and is subject to the penalty provisions of 18 U.S.C. § 841(1)(b)(C); more specifically, the Court finds John Pascucci is responsible under the United States Sentencing Guideline § 2D1.1(c)(8) for 90.7 kilograms of marijuana for a base offense level of 24, which at criminal history category II and with a three level reduction for acceptance, provides a guideline sentencing range of forty-one to fifty-one months.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 19th day of October, 2009